2026 IL App (1st) 241217-U

THIRD DIVISION
June 30, 2026

No. 1-24-1217

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 13372 |
| | ) | |
| AARON MILLER, | ) | Honorable |
| | ) | Nicholas Kantas, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the second-stage dismissal of defendant's postconviction petition and rejecting his contention that postconviction counsel provided unreasonable assistance.

¶ 2    After a physical altercation with his girlfriend, defendant Aaron Miller ran away from two Chicago police officers, Officer Grace Nowak[1] (Officer Nowak) and Officer Jenelyn Figueroa (Officer Figueroa), and entered his sport utility vehicle (SUV).  Officer Nowak was injured as she held on to the side of the SUV while defendant drove erratically through an alley and struck a building.  During the incident, Officer Figueroa shot defendant.  Following a bench

_____

[1] Grace Nowak was formerly known as Grace Foster.

trial in the circuit court of Cook County, defendant was convicted of multiple offenses— including the attempted murder of Officer Nowak—and was sentenced to 13 years in prison. Defendant filed a *pro se* postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), claiming that his trial counsel failed to inform him that Officer Figueroa had used her friend's firearm (and not her own service weapon) to shoot defendant and that counsel failed to investigate or to use this information to challenge Officer Figueroa's testimony. The petition advanced to second-stage proceedings under the Act, and counsel was appointed to represent defendant; postconviction counsel filed a supplemental petition and certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). The State subsequently filed a motion to dismiss the petition, which was granted.

¶ 3 Defendant advances three primary contentions on appeal. He initially argues that his postconviction petition made a substantial showing that his trial counsel provided ineffective assistance by failing to use available impeachment evidence to contest Officer Figueroa's credibility and to support the defense theory asserted against the attempted murder charge, *i.e.*, that defendant was trying to flee but had no intent to kill the officers. Defendant also contends that his postconviction petition made a substantial showing that the State knowingly used perjured testimony to help secure his attempted murder conviction where Officer Figueroa testified that she used "my weapon" on the day of the incident. Finally, defendant alternatively contends that the dismissal should be reversed and this matter should be remanded for second-stage proceedings with new counsel where the record established that postconviction counsel provided unreasonable assistance by failing to properly shape a constitutional claim of a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)), which was supported by an undisclosed report attached to the supplemental petition. As discussed below, we affirm the dismissal of

2

defendant's petition, and we reject his alternative argument regarding his postconviction counsel.

¶ 4                                    BACKGROUND

¶ 5                    *Criminal Charges and Preliminary Matters*

¶ 6     Defendant was charged by information with 13 counts relating to events on June 5, 2011, discussed below: attempted first degree murder and aggravated battery as to both Officer Nowak (counts 1 and 9) and Officer Figueroa (counts 2 and 10); home invasion and residential burglary as to Adele Mecher (counts 3, 4, 5, and 6); and criminal sexual assault, kidnapping, aggravated battery, and unlawful restraint as to Y.D.[2] (counts 7, 8, 11, 12, and 13).

¶ 7     More than a year before the trial, the trial court performed an *in camera* review of documents subpoenaed by the State from the Illinois Police Review Authority (IPRA)[3] regarding Officer Figueroa's shooting of defendant.  During a hearing in August 2012, the trial court stated that the documents were "relevant to the issues in the case," and the assistant state's attorney (ASA) stated she would provide a copy of the documents to defense counsel.

¶ 8                                 *Trial Testimony*

¶ 9     The matter proceeded to a bench trial commencing in October 2013, where the testimony and other evidence included the following.

¶ 10                                      Y.D.

¶ 11    Y.D. testified that she and defendant had dated for 14 years, shared two daughters, and had recently become engaged.  After denying any "domestic issues" with defendant, she was questioned by the ASA regarding prior instances where the police were called to her residence.

---

[2] We refer to Y.D. by her initials to protect her privacy.  See *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1, n.1.

[3] The IPRA was an independent agency created by the City of Chicago in 2007 to investigate police misconduct allegations.  *Lesner v. Police Board of the City of Chicago*, 2016 IL App (1st) 150545, ¶ 23.  In 2017, the IPRA was succeeded by a new entity, the Civilian Office of Police Accountability (COPA).  *Burg v. Brown*, 2023 IL App (1st) 211449-U, ¶ 16, n.3.

When Y.D. testified that she could not recall these incidents, the ASA questioned her regarding her statements to an IPRA investigator on June 5, 2011, regarding the incidents.

¶ 12     Y.D. testified that defendant was intoxicated as he entered their residence in the early morning hours of June 5, 2011.  According to Y.D., defendant was taking psychiatric medication and should not have consumed alcohol.  She testified that he was "venting" to her in their bedroom and was talking excessively.  After Y.D. testified at trial that she and defendant went to sleep and "nothing happened," she was questioned regarding her conversation with an ASA at the police department on the afternoon of June 5, 2011.  During the conversation, which was memorialized in a written statement signed by Y.D., she told the ASA that defendant had demanded sex; he spit in her face after she refused; and she felt "intimidated" and "gave in to" defendant, engaging in oral and vaginal sex with him.  At trial, she denied telling an investigator on June 5, 2011, that she and defendant had been "broken up" for one month at that time.

¶ 13     Y.D. testified that she wanted defendant to leave their residence after they woke up on June 5, 2011, as he was "getting on [her] nerves."  She needed a "breather," so she lied to defendant by telling him that she had to pick up her parents.  Defendant, however, decided to join her and to drive their vehicle, a yellow Ford Escape SUV.  As they stopped near the United Center in Chicago, Y.D. lied to defendant so he would leave the vehicle.  Y.D. then exited the vehicle, jumped over a fence, and ran to an elderly woman standing in a backyard.  After the woman allowed Y.D. to enter her residence to contact the police, Y.D. observed defendant entering the residence through a window.

¶ 14     Y.D. testified that defendant followed her into the basement, where he pulled her hair and pulled her by the hand to lead her outside.  While Y.D. testified at trial that he touched her neck "for a second," she had informed an ASA on the date of the incident that defendant had choked

her for a few seconds, grabbed her hair, and struck her in the head. As defendant pulled Y.D. out of the residence, two female police officers arrived. Y.D. testified that defendant released her hand, ran past the officers, and jumped into his vehicle to "escape from the officers." One of the officers was able to grab on to the driver's side door before it was fully closed. Y.D. testified that she then heard a crash and gunshots.

¶ 15                                        Adele Mecher

¶ 16     Adele Mecher (Mecher) testified that she resided in the 2000 block of West Monroe Street. As Mecher stood in her garden on the morning of June 5, 2011, a woman—Y.D.— climbed over her fence. After Y.D. asked for help, Mecher took her inside her residence, locked the door, and called the police. Mecher then heard Y.D. state "he's climbing through the window," so Mecher instructed her to run to the basement; the man who had entered the residence followed Y.D. into the basement. Mecher ran outside, blowing her whistle and screaming for help. She initially ran toward a nearby community center but returned to her residence when she realized the center was closed.

¶ 17     When Mecher arrived at home, she observed an empty police vehicle with its doors open. Upon noticing Y.D. standing outside, Mecher escorted her to the police vehicle; the women entered the vehicle and closed the doors. Mecher heard gunshots while sitting in the vehicle.

¶ 18                         Samuel Perez, Jr. and Timothy Peloquin

¶ 19     Samuel Perez, Jr. (Perez) testified that he took a motorcycle class in a parking lot across from the United Center on the morning of June 5, 2011. While waiting for the class to begin, Perez heard noises behind him, which sounded like a whistle and "crashing sounds." Shortly thereafter, he heard tires screeching. When Perez looked back, he observed a yellow SUV exiting from the alley, hopping the curb, and then stopping. According to Perez, a police officer

hanging from the driver's side jumped off the vehicle and fired two or three shots at the driver.

¶ 20    Timothy Peloquin (Peloquin), who was working at the motorcycle school on June 5, 2011, testified that he noticed a yellow SUV traveling quickly through an intersection. Approximately 20 minutes later, Peloquin heard gunshots. He crouched down behind a shipping container and peeked out at the street. Peloquin noticed the yellow SUV positioned toward the curb, as well as a police officer crouched outside of the driver's side door, shouting at the driver.

¶ 21                    Valerie Cobb and Howard Wright

¶ 22    Valerie Cobb (Cobb), a neighbor of Mecher, testified that when she looked out of her bedroom window on the morning of June 5, 2011, she observed a man running and two uniformed female police officers chasing him. As the man jumped into a yellow vehicle, the officers yelled "stop" two or three times. According to Cobb, one officer grabbed on to the driver's side of the vehicle while the door remained open, as the other officer reached into the passenger side toward the driver. Cobb testified that the "vehicle took off with screeching tires." The officer on the driver's side hit a pole, and then Cobb heard multiple "boom" sounds in the alley and three or four gunshots. During cross-examination, Cobb estimated that defendant's speed while driving was 15 miles per hour.

¶ 23    Cobb's boyfriend, Howard Wright (Wright), testified that he went outside when he heard someone yelling and blowing a whistle. Wright observed a man running toward a yellow SUV while two female officers chased him. When the man entered the vehicle, one officer reached for his hand and the keys from the driver's side, while the other officer was on the passenger side. According to Wright, the vehicle "zoomed off" at a speed of 10 or 20 miles per hour. While an officer was "halfway" in the vehicle on the driver's side, Wright watched the vehicle strike a pole and heard "boom" sounds as the vehicle "hit walls, garbage cans, everything."

Wright then heard multiple shots.

¶ 24                              Officer Zbigniew Niewdach

¶ 25    Officer Zbigniew Niewdach (Officer Niewdach), a forensic investigator with the Chicago

Police Department (department), testified that he and an evidence technician took photographs

and videos near the 2000 block of West Monroe following the incident on June 5, 2011.

The photographs depicted scrapes and yellow markings on an exterior wall of a brick building, as

well as yellow markings on a telephone pole.  Officer Niewdach also testified regarding

photographs of a yellow Ford Escape SUV, which had scrape marks on the driver's door and

front driver's side fender and front wheel, damage to the driver's side view mirror and door

handle, and a flat tire.  During cross-examination, Officer Niewdach testified that five expended

9 mm shell casings were recovered at the scene.  He was also questioned regarding a photograph

which depicted a pair of handcuffs hanging near the steering wheel of the SUV.

¶ 26                              Officer Jenelyn Figueroa

¶ 27    Officer Figueroa testified that she wore a police uniform and utility belt as she patrolled

in a marked vehicle with Officer Nowak on June 5, 2011.  When asked what was on her utility

belt, Officer Figueroa responded, "My weapon, a mace, asp,[4] my cuffs."

¶ 28    After receiving a call regarding a burglary in progress, the officers drove to the

2000 block of West Monroe and exited the police vehicle.  Officer Figueroa observed a male

individual—who she identified in court as defendant—pulling a woman by her hair.

Officer Figueroa directed defendant to release the woman, and he complied.  When the officers

approached defendant, he ran east on Monroe through an empty lot and into an alley.  Officer

Figueroa and Officer Nowak chased defendant on foot.

---

[4] The term "asp" appears to refer to a tactical baton.

¶ 29    Defendant ran to a yellow SUV parked in the alley, opened the driver's side door, and sat in the vehicle. When Officer Figueroa reached the vehicle, she opened the passenger door and sat in the passenger seat, facing defendant. She observed Officer Nowak from the waist up on the driver's side of the vehicle with the door open. As Officer Nowak attempted to handcuff defendant, both officers attempted to confiscate his keys. According to Officer Figueroa, defendant pushed and "nudg[ed]" her with his elbow, and he turned on the vehicle.

¶ 30    Officer Figueroa testified that defendant accelerated "very, very quickly," and the officers yelled at him to stop the vehicle. As he traveled down the alley toward a building, he stated, "f*** you, I'm going to kill you both." After hitting the building with the "whole driver's side" of his vehicle, defendant "continued to accelerate even more." Officer Figueroa testified that he then told her "shoot me, I'm going to kill you both." Officer Nowak continued holding on to the vehicle as it ran against the building. Upon reaching the mouth of the alley, defendant again stated "shoot me, I am going to kill you both." As defendant continued to accelerate toward a utility pole, Officer Figueroa directed him to stop the vehicle, and he stated a third time "shoot me, I'm going to kill you both." Officer Figueroa then testified, "And as he proceeded to accelerate towards the pole, that's when I shot him."

¶ 31    During cross-examination, Officer Figueroa confirmed that she did not observe defendant in the possession of any weapon. Defense counsel questioned Officer Figueroa regarding her preliminary hearing testimony, wherein she stated that Officer Nowak "was hanging onto the steering wheel trying to pull herself as much as she can inside the car, but she was still outside." When Officer Figueroa testified at trial that she did not know how fast defendant was driving, defense counsel questioned her regarding her IPRA statement, wherein she estimated that defendant was driving at a speed of 50 or 60 miles per hour.

¶ 32    The trial court asked Officer Figueroa how the SUV came to a stop.  She testified that when she initially shot defendant, the vehicle hit the curb, and defendant placed the vehicle in reverse.  As the vehicle traveled in reverse toward another utility pole, Officer Figueroa shot defendant again; he fell out of the open driver's side door, and the vehicle slowly stopped.

¶ 33                                    Officer Grace Nowak

¶ 34    Officer Nowak testified that after chasing defendant to the SUV, she attempted to pull him out of the vehicle and handcuff him.  She grabbed his left arm as he pushed her away and ignored her commands to "stop."  After defendant started to drive, Officer Nowak jumped up on the running board of the SUV.  According to Officer Nowak, defendant drove into a garbage can and then into the side of a brick building, as she was hit and pushed by the vehicle door.  The vehicle then struck a telephone pole and entered the street.  Officer Nowak testified that, while defendant drove the vehicle, he stated "something in the effect of he was going to kill us."  She heard this statement only once.  Although she had previously been "[h]anging onto the wheel," she "just kind of [fell] off the vehicle" as it exited the alley.  Her left ankle and right knee sustained bruising and swelling.

¶ 35    During cross-examination, Officer Nowak testified that she never observed defendant with a firearm.  Defense counsel also questioned her regarding her IPRA statement.  Officer Nowak was asked by the IPRA investigator to estimate defendant's driving speed, and she responded to the investigator: "I don't know, 15, 20 miles an hour.  I *** don't know."  Officer Nowak further testified that she fired her weapon when the SUV reversed toward her.

¶ 36                        *Closing Arguments, Ruling, and Sentencing*

¶ 37    The trial court denied defendant's motion for a directed finding, and defendant declined to testify.  During closing arguments, defense counsel argued that defendant did not show intent

to kill either officer. Defense counsel maintained that defendant's intent was to flee and that the SUV swerved into the building due to Officer Nowak pulling on the steering wheel. Defense counsel also noted discrepancies between the testimonies of the two officers as to defendant's driving speed and the number of times he threatened to kill the officers. Observing that "[t]here are credibility issues here," defense counsel intimated that the officers could state that defendant was trying to kill them to justify the discharge of their firearms. The ASA argued, in part, that defendant's intent to kill was evidenced by his decision to accelerate instead of stopping the SUV and his express verbal threats toward the officers.

¶ 38     Defendant was found guilty on multiple counts, including the attempted first degree murder count as to Officer Nowak. His original and supplemental posttrial motions were denied. He was sentenced to concurrent prison terms of 13 years on the attempted murder count relating to Officer Nowak (count 1), 8 years on the home invasion count relating to Mecher (count 3), 4 years on the aggravated battery count relating to Officer Figueroa (count 10), and 3 years on the aggravated battery count as to Y.D. (count 12). Defendant timely filed a direct appeal, which he subsequently dismissed.

¶ 39                                    *Postconviction Petition*

¶ 40     Defendant filed a *pro se* petition for postconviction relief on September 30, 2015, wherein he asserted multiple claims, including ineffective assistance of trial counsel.

¶ 41     Among other things, defendant alleged that Officer Figueroa repeatedly shot him "with a weapon that was not registered to her or any other police officer, nor was it inspected by the Chicago Police [Department]." The firearm used by Officer Figueroa during the shooting was registered to her friend, Leanora Dumag (Dumag). According to defendant, multiple police officers conspired to conceal the illegal activity of Officer Figueroa and the department.

The petition also alleged that Officer Figueroa's trial testimony that she carried "*my* weapon" (emphasis added) on her utility belt at the time of the shooting was "false and misleading" and that her statements regarding defendant's driving speed and verbal threats were unreliable.

¶ 42    The attachments to the postconviction petition included various documents, which defendant represented that he received in July 2014 as part of discovery responses relating to a federal tort claim he had filed.  A tactical response report prepared on June 5, 2011, listed the serial number of the "[d]epartment issued" Glock 9 mm firearm used by Officer Figueroa to shoot defendant as "PYY302."  In a crime-scene report submitted on June 6, 2011, Officer Niewdach stated that Officer Figueroa's handgun had been received at the scene and unloaded.  A firearms receipt from the department's Crime Laboratory Division, however, listed the recovered weapon as a black Glock 9 mm pistol with a serial number of LCG704.  A memorandum dated September 30, 2011, from the department's Evidence and Recovered Property Section indicated that Officer Figueroa had arrived that morning to retrieve her duty weapon; she subsequently informed an officer that the weapon which had been stored in the sealed inventory bag—LCG704—was not her weapon.  The Department of Justice completed a firearms trace summary later that day, which revealed that LCG704 was owned by Dumag.  A CLEAR[5] report generated on October 4, 2011, listed PYY302 as registered to Officer Figueroa.

¶ 43    The attachments to the postconviction petition also included multiple excerpts of interviews conducted by the IPRA, including a statement provided by Officer Figueroa "under duress" on September 23, 2011, regarding the events of June 5, 2011.  During her IPRA interview, Officer Figueroa denied the allegation that she violated department directives relating

---

[5] "CLEAR" appears to refer to the Chicago Police Department's Citizen and Law Enforcement Analysis and Reporting system.

to the use of force policy by using deadly force against defendant when it was not warranted.

¶ 44    Dumag, an accountant who was Officer Figueroa's friend and combative training partner at Vanguard Tactical Systems, provided a statement to the IPRA on October 6, 2011. Dumag relayed that Officer Figueroa telephoned her on September 30, 2011, and asked her for the serial number on her pistol. Dumag then discovered that she had Officer Figueroa's handgun and that Dumag's own weapon was used in a police-involved shooting. While Dumag was unable to explain how or when the switch occurred, she noted that "we secure our weapons when we walk in in a secure drawer"—seemingly referring to a drawer at Vanguard Tactical Systems. Dumag also stated that her weapon looked identical to Officer Figueroa's weapon, *i.e.*, "they both have [the] same rubber grip, same night sights on it, and the same holster."

¶ 45    In his postconviction petition, defendant asserted that his trial counsel did not inform him of any issue with Officer Figueroa's service weapon and did not investigate or properly utilize the available information relating to the IPRA investigation of the shooting to challenge the "credibility and culpability" of Officer Figueroa and Officer Nowak during the trial. As the officers' testimony was critical to his convictions, defendant maintained that his trial counsel's conduct constituted ineffective assistance.

¶ 46                                    *Second Stage Proceedings*

¶ 47    The postconviction petition was docketed for second-stage proceedings, and the Law Office of the Cook County Public Defender was appointed to represent defendant. Through his postconviction counsel, defendant filed motions to subpoena records from the IPRA, the department, and the City of Chicago Inspector General relating to this matter, which the circuit court granted. The circuit court subsequently entered and continued defendant's motion for discovery depositions of multiple police officers and Dumag, opining that such depositions

would be "more appropriate" if the petition continued to third-stage proceedings.

¶ 48　　In a supplemental postconviction petition filed by his postconviction counsel, defendant asserted claims alleging: (a) a due process violation for presenting false police reports to defendant's trial counsel and false testimony by the police officers; (b) that defendant's jury waiver was not made knowingly and voluntarily; (c) ineffective assistance of trial counsel for failure to communicate and disclose discovery and failure to properly investigate and use evidence; (d) a due process violation for failure to correct perjury; and (e) cumulative error based on the foregoing issues.

¶ 49　　Postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (July 1, 2017). The attachments to the supplemental petition included a Law Enforcement Agencies Data System (LEADS) report which indicated that the firearm with serial number LCG704 (used by Officer Figueroa in the June 5, 2011, shooting and later identified as owned by Dumag) was reported stolen on July 6, 2011—*i.e.*, prior to Officer Figueroa's alleged discovery of the "mix-up" when she went to retrieve her weapon. The attachments also included an affidavit from an investigator who interviewed the owner of Vanguard Tactical Systems; the owner informed the investigator that his company had a protocol in place to secure firearms, and "each person stored his/her weapon in a separate locked box and with his/her own key."

¶ 50　　The State filed an original and amended motion to dismiss the postconviction petition arguing, in part, that defendant failed to establish a conspiracy to cover up Officer Figueroa's use of a firearm other than her service weapon. The State further contended that the totality of trial counsel's conduct demonstrated that he engaged in meaningful adversarial testing of the State's case. Defendant responded, in part, that his trial counsel knew there were issues with Officer Figueroa's weapon but failed to share that information with defendant.

¶ 51    The circuit court[6] granted the State's motion to dismiss the postconviction petition and denied defendant's motion to reconsider.  Defendant timely filed this appeal.

¶ 52                                    ANALYSIS

¶ 53    Defendant contends on appeal that his postconviction petition made a substantial showing that his trial counsel provided ineffective assistance by failing to use available impeachment evidence which would have challenged Officer Figueroa's credibility.  He also asserts that his petition made a substantial showing that the State knowingly used perjured testimony to help secure defendant's attempted murder conviction where Officer Figueroa falsely testified that she used "my weapon" during the incident.  In the alternative, defendant contends we should remand this matter for second-stage proceedings with the appointment of new counsel where the record established that postconviction counsel provided unreasonable assistance by failing to properly shape a constitutional claim of a *Brady* violation, which was supported by the undisclosed LEADS report attached to the supplemental petition.  We begin with a brief overview of the Act.

¶ 54                          *Postconviction Process*

¶ 55    The Act provides a framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during their trial or sentencing.  725 ILCS 5/122-1(a)(1) (West 2024); *People v. Edwards*, 197 Ill. 2d 239, 243-44 (2001).  Proceedings under the Act occur in three stages.  *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996).  At the first stage, the circuit court independently reviews the postconviction petition within 90 days of its filing and determines whether it is frivolous or is patently without merit.  *Edwards*, 197 Ill. 2d at 244; 725 ILCS 5/122-2.1(a) (West 2024).  If the court determines that the

---

[6] While Judge Lawrence Flood presided over the trial and dismissed the postconviction petition, Judge Nicholas Kantas ruled on the motion to reconsider.

petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. *Id.* A petition which is not summarily dismissed advances to the second stage for further proceedings. *People v. Addison*, 2023 IL 127119, ¶ 18.

¶ 56 At the second stage, the court may appoint counsel to represent an indigent defendant and, if necessary, to file an amended petition; the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2024). If the court appoints counsel at the second stage, Illinois Supreme Court Rule 651(c) requires that the record demonstrates that counsel has consulted with the defendant, examined the record of the trial proceedings, and made any necessary amendments to the *pro se* petition. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). If the petition and the accompanying documentation make a substantial showing of a constitutional violation, the petition will proceed to the third stage, an evidentiary hearing on the merits. *Edwards*, 197 Ill. 2d at 246; 725 ILCS 5/122-6 (West 2024). See *People v. Domagala*, 2013 IL 113688, ¶ 35 (describing the "substantial showing" of a constitutional violation which must be made at the second stage as "a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief" (emphasis in original)). "At a third-stage evidentiary hearing, the trial court acts as factfinder, determines witness credibility and the weight to be given to particular testimony and evidence, and resolves any evidentiary conflicts." *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 97.

¶ 57 In this case, defendant's postconviction petition was dismissed at the second stage. "We review a trial court's dismissal of a postconviction petition at the second stage *de novo*." *Addison*, 2023 IL 127119, ¶ 17. *De novo* consideration means that the reviewing court performs the same analysis that the circuit court would perform and owes no deference to the lower court's

reasoning or judgment. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 58                    *Ineffective Assistance of Counsel*

¶ 59    Defendant contends on appeal that his postconviction petition made a substantial showing that his trial counsel provided ineffective assistance. A defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois Constitution. *Domagala*, 2013 IL 113688, ¶ 36 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, § 8). An ineffective assistance of counsel claim is subject to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hatter*, 2021 IL 125981, ¶ 25. "Under *Strickland*, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and the defendant was prejudiced by counsel's substandard performance." *People v. Agee*, 2023 IL 128413, ¶ 50. Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. *People v. Coleman*, 183 Ill. 2d 366, 397 (1988).

¶ 60    To satisfy the performance prong of *Strickland*, a defendant "must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). "The court gives a great amount of deference to counsel's judgment and indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *People v. Bell*, 2021 IL App (1st) 190366, ¶ 63.

¶ 61    In this case, defendant's ineffective assistance of counsel claim is primarily based on his trial counsel's failure to use certain impeachment evidence—documents from the IPRA investigation regarding Officer Figueroa's weapon—to challenge Officer Figueroa's credibility. The decision whether to cross-examine or impeach a witness is generally a matter of trial

strategy which will not support a claim of ineffective assistance of counsel. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). Defendant observes, however, that where counsel "completely fails to use significant impeachment evidence to impeach a key witness, such conduct may not be sound strategy and may constitute ineffective assistance." *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24.

¶ 62    Based on our review of the record, we find that the conduct of defense counsel fell within the "wide range of reasonable professional assistance." *Bell*, 2021 IL App (1st) 190366, ¶ 63. Defense counsel elicited key facts during the cross-examination of Officer Figueroa, including that defendant was not observed with a weapon. When Officer Figueroa testified that she did not know defendant's driving speed, defense counsel questioned her regarding her statement to the IPRA investigator, in which she estimated a speed of 50 or 60 miles per hour. During closing statements, defense counsel highlighted the discrepancies between the representations of Officer Figueroa and Officer Nowak as to both the defendant's driving speed and the number of verbal threats made by defendant during the incident. Defense counsel further argued that "[c]redibility does come into play," as both officers were motivated to justify the discharge of their firearms during the incident. At the hearing on the posttrial motions, defense counsel expressly contended that the shooting and the IPRA investigation "gave the officers motive or reason to lie about the facts or the allegations against" defendant.

¶ 63    We further find that the postconviction petition failed to make a substantial showing of prejudice. The *Strickland* Court stated that a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In this case, defendant's petition did not make a

17

substantial showing of a reasonable probability that the outcome of the proceedings would have been different if his trial counsel had impeached Officer Figueroa regarding her service weapon.

¶ 64   Defendant was charged with attempted first degree murder as to Officer Nowak. Our supreme court has held that "to commit attempted first degree murder, the defendant must have the intent to kill without lawful justification." *People v. Guy*, 2025 IL 129967, ¶ 53. See *People v. Hopp*, 209 Ill. 2d 1, 13 (2004) (providing that "nothing less than intent to kill" is required for an attempted first degree murder conviction). As "the specific intent to take a life is a state of mind, it is rarely proven through direct evidence." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52.

¶ 65   Defendant contends on appeal that the issue of defendant's specific intent to kill Officer Foster "hinged on the credibility" of Officer Figueroa. We reject this contention. Although the testimony of Officer Figueroa and Officer Nowak was not identical, both witnesses described the same core facts which evidenced defendant's state of mind—that despite the officers' repeated commands to stop, defendant pressed the accelerator and drove into buildings and other structures while threatening to kill the officers, as Officer Nowak clung to the side of his vehicle. The physical evidence (*e.g.*, the damage to the SUV) and the testimony of the other witnesses, including Mecher's neighbors and the individuals at the motorcycle school, were consistent with the officers' description. The judge who presided over the bench trial and most of the postconviction proceedings characterized the evidence as "overwhelming" and noted that "the impeachment evidence in question—that Officer Figueroa used a different weapon to shoot the petitioner than her assigned duty weapon—would not have changed the outcome of the case."

¶ 66   For the foregoing reasons, we find that defendant failed to make a substantial showing that his trial counsel's representation was substandard or that any purported deficiency in

counsel's performance may have affected the outcome of the proceedings. We turn to the next issue.

¶ 67                                              *Perjured Testimony*

¶ 68      Defendant also contends on appeal that the postconviction petition made a substantial showing that the State knowingly used perjured testimony to help secure his attempted murder conviction. When questioned as to the contents of her utility belt, Officer Figueroa responded, in part, "my weapon." She subsequently testified "that's when I fired my weapon." Defendant asserts that Officer Figueroa's use of the word "my"—despite her knowledge that she fired Dumag's weapon—constituted perjury. Defendant further maintains that the State's knowing use of this perjury denied him due process where Officer Figueroa's statement could have been used to impeach her credibility and to suggest she was hiding her use of the wrong firearm.

¶ 69      The knowing use of perjured testimony by the State to obtain a criminal conviction constitutes a violation of due process of law. *People v. Munson*, 206 Ill. 2d 104, 147 (2002); U.S. Const., amends. V, XIV. This principle applies both where a prosecutor "procures false testimony and where the witness falsely testifies of his or her own accord and the prosecutor knowingly fails to correct the falsity." *Munson*, 206 Ill. 2d at 147. Accord *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The State's duty to correct false testimony extends to falsehoods that go 'only to the credibility of the witness.' " *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 62 (quoting *Napue*, 360 U.S. at 269).

¶ 70      A defendant bears the burden of proving that the State knowingly used perjured testimony "by clear, convincing and satisfactory evidence." *People v. Trimble*, 220 Ill. App. 3d 338, 346 (1991). In this case, although the weapon fired by Officer Figueroa was not her service weapon, it was the weapon which was on her utility belt and which she fired on June 5, 2011.

As Officer Figueroa's use of the possessive adjective "my" in this context did not suggest any falsehood or other impropriety, we reject defendant's claim of error. See *id.* Furthermore, even assuming that Officer Figueroa's testimony was false, there is no indication that it was material, for the reasons discussed above. See *People v. Smith*, 2025 IL App (1st) 221722-U, ¶ 57 (noting that a witness commits perjury if she gives false testimony regarding a material matter with the willful intent to provide false testimony). We thus conclude that defendant has not made the requisite showing that the State knowingly failed to correct perjured testimony, and we turn to the final claim of error.

¶ 71                                    *Postconviction Counsel*

¶ 72     Defendant alternatively contends that his appointed postconviction counsel provided unreasonable assistance by failing to properly shape a constitutional claim of a *Brady* violation, which was supported by the undisclosed LEADS report attached by postconviction counsel to the supplemental petition. Defendant maintains that we should reverse the dismissal of his postconviction petition and remand for new second-stage proceedings with the appointment of new postconviction counsel.

¶ 73     The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To succeed on a *Brady* claim, a defendant must establish that: (1) the undisclosed evidence was favorable to the defendant, as it is either exculpatory or impeaching; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) the defendant was prejudiced, as the evidence is material to guilt or punishment. *People v. Montanez*, 2023 IL 128740, ¶ 82. Evidence is "material" if there is a

reasonable probability that the result of the proceedings would have been different if the evidence had been disclosed. *Id.*

¶ 74    The attachments to the supplemental petition filed by postconviction counsel in this case included a LEADS report which indicated that the firearm used by Officer Figueroa was reported as stolen on July 6, 2011—more than two months before Officer Figueroa allegedly learned of the "mix-up" with the weapons. In the supplemental petition, counsel contended that this law enforcement document (and other documents) indicated a "cover up by the Chicago Police involving Officer Figueroa." While the supplemental petition alleged that the "police submitted falsified reports" to defense counsel in discovery, postconviction counsel did not frame the State's failure to provide the LEADS report as a *Brady* violation.

¶ 75    It is well established that there is no constitutional right to assistance of counsel during postconviction proceedings. *Addison*, 2023 IL 127119, ¶ 19. The right to assistance of counsel in postconviction proceedings is " 'a matter of legislative grace' " and a defendant is guaranteed only the level of assistance provided by the Act. *People v. Cotto*, 2016 IL 119006, ¶ 29 (quoting *People v. Hardin*, 217 Ill. 2d 289, 299 (2005)). See *People v. Turner*, 187 Ill. 2d 406, 410 (1999) (noting that the right to counsel in postconviction proceedings is "wholly statutory").

¶ 76    The Act has been interpreted as providing a postconviction petitioner with "reasonable" assistance, which is "less than that afforded by the federal and state constitutions." *Addison*, 2023 IL 127119, ¶ 19. Unlike at trial, where an attorney acts to protect a defendant from being "stripped of the presumption of innocence," postconviction petitioners have "already been stripped of the presumption of innocence and have generally failed to obtain relief on direct review of their convictions." *Id.* Postconviction counsel is appointed "not to protect postconviction petitioners from the prosecutorial forces of the State but to shape their complaints

into the proper legal form and to present those complaints to the court." *Id.*

¶ 77   To ensure that postconviction petitioners receive the requisite level of assistance, Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) outlines the duties of counsel in postconviction proceedings.  See *Addison*, 2023 IL 127119, ¶ 20.  Rule 651(c) requires that the record filed in a postconviction proceeding demonstrates that postconviction counsel "has consulted with petitioner by phone, mail, electronic means, or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions."  Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Compliance with the duties set forth in Rule 651(c) is mandatory and may be demonstrated by a certificate filed by postconviction counsel.  *Addison*, 2023 IL 127119, ¶ 21.

¶ 78   Postconviction counsel in this case filed a Rule 651(c) certificate, which created a rebuttable presumption that defendant received reasonable assistance of postconviction counsel. See *People v. Smith*, 2022 IL 126940, ¶ 29.  Defendant thus bears the burden of overcoming that presumption by "showing that postconviction counsel did not substantially comply with the strictures of the rule."  *Addison*, 2023 IL 127119, ¶ 21.  Postconviction counsel fails to provide reasonable assistance where counsel identifies claims which are "worth pursuing" but fails to "shape them into proper form."  See *id.* ¶ 26.  See *People v. King*, 39 Ill. 2d 295, 297 (1968) (noting that the Act contemplates that the assistance by an attorney ensures that "any constitutional claims of merit *** will be properly recognized, developed and articulated").

¶ 79   Applying the foregoing framework, we agree with the State's contention that defendant has failed to establish the viability of a *Brady* claim, as the LEADS report is not "material either to guilt or punishment."  *Brady*, 373 U.S. at 87.  "To establish materiality, an accused must show

the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks and citations omitted.) *People v. Beaman*, 229 Ill. 2d 56, 74 (2008). As discussed above, the record on appeal supports the circuit court's finding that defendant's specific intent (as to the attempted murder count involving Officer Nowak) was established by overwhelming evidence. As defendant has failed to overcome the presumption that his postconviction counsel provided reasonable assistance (see *Addison*, 2023 IL 127119, ¶ 21), we reject her alternative claim of error.

¶ 80                                          CONCLUSION

¶ 81    For the reasons discussed above, the judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 82    Affirmed.